## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-cv-01178

JEFFREY GONZALES,

      Plaintiff,

v.

UNIVERSITY OF COLORADO, through its Board, THE REGENTS OF THE UNIVERSITY OF COLORADO, a body corporate,

      Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Dr. Jeffrey Gonzales for his Complaint states:

## INTRODUCTION

1.      This is an employment discrimination suit brought by a former employee of Defendant University of Colorado who worked as an Assistant Professor at the University of Colorado's School of Medicine in the Department of Anesthesiology and was discriminated against based on his race and national origin and retaliated against and terminated from his employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII").

## PARTIES

2.      Plaintiff Dr. Jeffrey Gonzales is a resident of the State of Colorado.

3.      Defendant University of Colorado ("CU") is a state institution of higher education established and regulated by Article IX, §§ 12 and 13, Colorado Constitution, and State statutory law, C.R.S. § 23-20-101, *et seq*.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 and specifically under Title VII, as amended, 42 U.S.C. § 2000e *et seq.*

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because the employment practices alleged to be unlawful were committed in the District of Colorado.

6.      At all relevant times, Defendant CU was covered by the definition of "employer" set forth in 42 U.S.C. § 2000e(b) of Title VII.

## SPECIFIC ALLEGATIONS

7.      Defendant CU is engaged in the business of higher education.

8.      CU operates the School of Medicine on the Anschutz Medical Campus in Aurora, Colorado.

9.      Plaintiff is a board certified anesthesiologist.

10.     Plaintiff is Hispanic and of Mexican descent.

11.     Plaintiff worked for CU as an Assistant Professor at the School of Medicine's Department of Anesthesiology from August 13, 2014 until he was terminated on June 3, 2016.

12.     During his employment with CU, Plaintiff was the only Hispanic employee in the Department of Anesthesiology, with the exception of one resident.

13.     Plaintiff was recruited for the position at CU by the former Chair of the Department of Anesthesiology, Tom Henthorn, because of Plaintiff's knowledge, skill set, and

2

experience in acute pain management, as well as his experience in developing and producing quality improvement programs for patients and hospitals, including Northwestern University.

14.     Plaintiff and his family relocated to Colorado to accept the position with CU.

15.     Throughout his employment at CU, Plaintiff performed satisfactorily or better, as evidenced by his clinical, hospital, and educational production, his patient and resident evaluations, and his annual performance reviews.

16.     As an Assistant Professor, Plaintiff's duties included teaching, research, service, and clinical responsibilities, i.e., serving as a general anesthesiologist on scheduled days, including covering a variety of surgical cases and an equal number of calls.

17.     Beyond these duties, Plaintiff sought and was recruited for addition opportunities to contribute to CU and the community at large.  For example:

a.  In October 2014, Plaintiff agreed to serve as an attending physician on the Acute Pain Service ("APS") one to two days per month;

b.  In November 2014, Plaintiff joined a department committee to develop quality improvement programs at the request of former Chair Henthorn;

c.  Plaintiff volunteered to assist in the formation of programs for enhanced recovery in urology, breast cancer, and colorectal patients;

d.  Plaintiff served as the physician lead on the breast and colorectal groups and as a member of the executive committee for the entire hospital program and pancreatic program;

e.  In August 2015, Plaintiff  was asked to be a part of CU's National Surgical Quality Improvement Program committee;

3

f.  Plaintiff has been invited to speak at numerous international and national meetings and continuing medical education courses and has given grand rounds at universities such as CU, Duke, and Northwestern;

g.  He actively participated in the production of lectures, abstracts, manuscripts, and learning tools for CU and national societies;

h.  Plaintiff was invited to meet with U.S. Representative Mike Coffman to discuss the opioid epidemic and multimodal analgesia for patients having surgery in Colorado and the U.S. in October 2015; and

i.  At the time of Plaintiff's termination, he was highly involved with the residency program, including serving as one of the primary individuals working on revising the entirety of the CA-1 resident orientation program, being asked by two first year residents to serve as their academic advisor for the remainder of their residencies, and mentoring a second year resident on her resident talk and planning to serve as her research advisor at her request.

18.    In early 2015, Plaintiff expressed interest to the former vice chair of clinical operations in the Department of Anesthesiology in being a contributor in the expansion of a surgery center in Lone Tree for which Plaintiff already provided services.

19.    In fact, and at that same time, Plaintiff had been asked if he was interested in assuming the medical director position at the Lone Tree Surgery Center when the current director chose to retire.

20.    In January 2016, CU replaced former Chair Henthorn with Dr. Vesna Jevtovic-Todorovic.

4

21.     Chair Todorovic met with Plaintiff on February 3, 2016 to conduct Plaintiff's annual performance review and discuss his clinical responsibilities and potential for academic promotion.

22.     In Plaintiff's review, Chair Todorovic gave him an "outstanding" rating, effusively praised Plaintiff's accomplishments in the areas of clinical work, teaching and mentoring, research, scholarly activity, service/administration/advocacy, and professionalism and citizenship, and noted that he "is ready for promotion" to Associate Professor or full Professor.

23.     At that meeting, Chair Todorovic also requested that Plaintiff personally be the lead to help revise the APS and its role for the hospital as she had concerns over whether or not it was functioning at an optimal level prior to her arrival.

24.     While attending a professional conference as an invited speaker in Vail, Colorado, on March 2, 2016, Plaintiff received a call from a CU colleague advising him that he should speak to Chair Todorovic about serving as the medical director of a new hospital opening in Broomfield, Colorado.

25.     Immediately after that call, on March 2, 2016, Plaintiff went to a hotel restaurant to have lunch with three colleagues who were practicing anesthesiologists.

26.     During lunch, Plaintiff and his colleagues discussed a number of topics, including their previous work at Northwestern Memorial Hospital, their children, and pain management generally.

27.     The only topics that they discussed that pertained to CU were Plaintiff's experience as a lecturer and groups that he has worked with at CU and a complaint from several

residents of CU's Department of Anesthesiology that the residents were confused by the diversity of types, volumes, and concentrations of local anesthetics that different attending physicians used for nerve blocks.

28.     On Friday, March 4, Plaintiff received a text message from one of his colleagues with whom he had lunch in Vail.

29.     The text message was a screenshot of a text message that the colleague had received from Dr. Matthew Fiegel, the Director of APS, that said, "one of my attendings heard Jeff Gonzales talking shit about the APS to you.  We've had a history of Jeff doing this and we need to address it."

30.     Plaintiff's colleague replied to Dr. Fiegel immediately and then at least twice in the following weeks that Plaintiff had not said anything negative about APS, the Department of Anesthesiology, or CU.

31.     Later that day, Plaintiff requested that he be taken off of APS as a provider in an attempt to avoid conflict with Dr. Fiegel and because Plaintiff planned to cover his remaining scheduled shifts and he knew that obtaining coverage for his future APS shifts would not be an issue.

32.     Plaintiff promptly sent an e-mail to Chair Todorovic to let her know that he was removing himself from APS as an attending provider and asked that she let him know if that would pose an issue with his employment.

33.     A short time later, Chair Todorovic scheduled a meeting regarding an "urgent matter" with Plaintiff for Monday, March 7, 2016.

6

34.     During the March 7 meeting, where Plaintiff, Chair Todorovic, Dr. Fiegel, and Dr. Nate Weitzel were present, Dr. Fiegel expressed repeatedly that Plaintiff's departure from APS would be a terrible thing because of Plaintiff's positive contributions.

35.     Plaintiff replied that his decision was based on a personal issue that he would be happy to disclose only to Chair Todorovic.

36.     Although Drs. Fiegel and Weitzel and Chair Todorovic claimed that Plaintiff's departure had left APS "scrambling" for coverage, all three acknowledged that, as of the March 7 meeting, coverage for Plaintiff's shifts had already been secured.

37.     At the conclusion of the meeting, Chair Todorovic requested that Drs. Fiegel and Weitzel leave so that she could meet alone with Plaintiff.

38.     During his one-on-one meeting between Chair Todorovic, Plaintiff disclosed the content of the text message from Dr. Fiegel that Plaintiff's colleague had forwarded to Plaintiff and explained that he was resigning from APS to avoid an additional confrontation about the matter.

39.     In response, Chair Todorovic became infuriated and accused Plaintiff of being untrustworthy, of "acting like a little three year old boy," and asked in a condescending and demeaning manner what Plaintiff actually did at the hospital and for the Department of Anesthesiology.

40.     The next morning, Plaintiff expressed his concerns to staff in CU's Ombuds Office, who suggested that he meet with Dr. Barry Rumack in the Office of Professionalism about Dr. Fiegel's message and Chair Todorovic's inappropriate response to Plaintiff's concerns about Dr. Fiegel's message.

41.     Subsequently, Chair Todorovic and Dr. Fiegel made numerous disparaging remarks about Plaintiff "quitting" the APS to a group of Plaintiff's colleagues at an APS meeting that Plaintiff attended.

42.     When Plaintiff attempted to speak with Chair Todorovic again after this meeting about his concerns around Dr. Fiegel's message and her response to Plaintiff removing himself from APS, she treated him in a condescending and dismissive manner, accused him of making disparaging remarks about the APS and lying when he denied doing so, and asked him again what he "actually" did at CU.

43.     When Plaintiff responded by listing his clinical, committee, and service work. Chair Todorovic said, "well, we will just have to see how that goes" and, when Plaintiff said that he was concerned about how he was being treated, commented further that "there are many places to work in Denver" and questioned why Plaintiff had moved his family to Colorado for this job.

44.     On March 8, 2016, Plaintiff's colleague with whom he had lunch on March 2 forwarded another text message that he received from Dr. Fiegel about Plaintiff in which Dr. Fiegel commented that, "there's now a spot on the APS for a Mexican.  You interested?" referring to Plaintiff as "a Mexican."

45.     On or around March 14, Plaintiff reported this inappropriate comment about his national origin to CU's Title IX Office and mentioned that he was aware of a prior occurrence of race discrimination in the department, wherein a physician had left the department because of discriminatory behavior.

46.     The Deputy Title IX Coordinator, Will Dewese, with whom Plaintiff spoke on March 14, recommended that Plaintiff report his concerns to CU's Human Resources Department, which Plaintiff did on March 17.

47.     Around this time, Plaintiff reiterated his interest in the medical director positions at both the new facility in Broomfield and the existing Lone Tree Surgery Center but was told that Chair Todorovic informed the hiring officials that Plaintiff was "absolutely not" a candidate for either position despite the strong recommendations of a number of his colleagues that he be considered for these positions.

48.     On March 19, Chair Todorovic informed Plaintiff via email that she was conducting an investigation into Plaintiff and had determined that he had said disparaging things about the APS on March 2 and, furthermore, that Plaintiff was impulsive, unprofessional, and demeaning.

49.     Chair Todorovic provided neither examples to support her accusations nor the specific accusations against Plaintiff that had served as the impetus for the investigation despite Plaintiff's repeated requests for the same.

50.     On March 22, Plaintiff learned from an e-mail from Chair Todorovic that Dr. Csaba Gadjos was refusing to work with Plaintiff without providing a justification accordingly.

51.     Upon information and belief, Dr. Gadjos was encouraged to refuse to work with Plaintiff because of Dr. Gadjos's relationship with Drs. Fiegel and Weitzel.

52.     Plaintiff was finally able to meet with Dr. Barry Rumack in CU's Office of Professionalism on March 23, an appointment that he had scheduled back on March 9.

53.     During Plaintiff's meeting with Dr. Rumack, Plaintiff described the occurrences of early March 2016, including Dr. Fiegel's accusation that Plaintiff had been "talking shit" about APS and Dr. Fiegel's offensive comment about a spot opening up with the APS for "a Mexican."

54.     Dr. Rumack acknowledged that these were "serious offenses" that CU cannot tolerate and promised to investigate Plaintiff's complaint.

55.     In a subsequent meeting with Plaintiff, Dr. Rumack stated that he could only offer to facilitate a mediation between Plaintiff and Chair Todorovic.  Although Plaintiff appreciated the offer, he expressed a sincere fear that he would be further retaliated against if he elected to move forward with the mediation.

56.     On April 4, Plaintiff reiterated to Dr. Rumack in an e-mail that Plaintiff had come across information regarding prior race discrimination complaints within the Department of Anesthesiology and that Plaintiff was anticipating further retaliation as a result of his complaints.

57.     In the second or third week of April 2016, Plaintiff again contacted CU's HR Department by phone to express his concerns that:

    a.   he had not been considered for the medical director positions for either the Broomfield or Lone Tree facilities despite having been strongly encouraged to apply for these opportunities before he brought forward concerns about discrimination and retaliation;

    b.   the work environment had become exceedingly stressful and that he was being targeted due to his race and complaints about discrimination and retaliation; and

    c.   Chair Todorovic intended to terminate him.

58.     On May 3, Plaintiff met with Mr. Dewese and another employee from CU's Title

IX Office, Karey Duarte, to discuss his concerns about discrimination; Mr. Dewese and Ms.

Duarte assured Plaintiff that they would continue their investigation.

59.     On May 4, Plaintiff told Dr. Rumack, via e-mail, that the Title IX Office was

investigating his complaints and asked if he could meet again with Dr. Rumack to discuss his

concerns.

60.     Although Dr. Rumack agreed initially to meet on May 11, he subsequently

cancelled the meeting and failed to reschedule it.

61.     In April and/or May 2016, Chair Todorovic removed the medical director of the

Lone Tree Surgery Center and replaced him with Melanie Donnelly despite the strong

recommendation from Dr. Donnelly and other physicians that Plaintiff be appointed as the

medical director.

62.     When Plaintiff met with Chair Todorovic on May 19 to inquire as to why he was

not considered for the medical director position at the Lone Tree Surgery Center, she dismissed

his inquiry – stating that the decision had already been made – and again asked Plaintiff what it

was that he actually did at CU.

63.     During the May 19 meeting with Plaintiff, Chair Todorovic also told Plaintiff that

Dr. Gadjos had reported that Plaintiff was "hard to work with, difficult, and did not communicate

well," all of which were false.

64.     Chair Todorovic also brought up a complaint from a surgeon about a patient who

the surgeon and Plaintiff had treated together.  The surgeon alleged that the patient complained

that she had experienced post-operative complications because of Plaintiff.

65.    To the contrary, when Plaintiff contacted the patient for follow-up, she thanked him profusely for his work and vehemently denied that she had ever made a negative statement about Plaintiff.

66.    When Plaintiff told the patient that her purported negative statements about Plaintiff were recorded in her medical chart, she became very upset and adamantly stated that the records were falsified.

67.    On May 18, Ms. Duarte told Plaintiff that she was going to present the findings from her investigation of Plaintiff's complaint to Chair Todorovic.

68.    In response to Plaintiff's concern that he would be subjected to additional retaliation if Ms. Duarte provided the letter to Chair Todorovic, Ms. Duarte merely laughed.

69.    Despite Plaintiff's concerns, on May 24, Ms. Duarte produced the letter to Chair Todorovic stating that, although the Title IX Office had found Dr. Fiegel's conduct to be unprofessional, it was not severe.

70.    On May 31, Plaintiff was contacted by Chair Todorovic's assistant to schedule a meeting between Plaintiff and the Chair for June 2.

71.    When Plaintiff arrived at the meeting on June 2, Carlos Fernandez, the Department of Anesthesiology Business Manager, and Doug Kayson, the Director of HR, were present along with Chair Todorovic.

72.    Chair Todorovic asked Plaintiff if he knew why this meeting was being conducted and he responded that he did not.  When she asked Plaintiff if he was sure, Plaintiff said that the meeting could be because he had been in contact with the HR department and Title IX office.

73.    In response, Chair Todorovic smirked and said, instead, that the meeting was called because of a complaint that HR had received about Plaintiff from one of the senior anesthesiology residents regarding an incident that occurred more than four months earlier in January 2016.

74.    According to Chair Todorovic, the resident reported that, in January 2016, Plaintiff had asked the resident to look up a lewd reference on urbandictionary.com and that Plaintiff had made the comment "all research is bullshit."

75.    Plaintiff vehemently denied making either statement and, in particular, repeatedly asked why he would have said "all research is bullshit" given his extensive background as a published researcher.

76.    After the June 2 meeting with Chair Todorovic, Plaintiff recalled that he and the resident who had allegedly complained had done an infraclavicular nerve block on a patient the morning of January 24.

77.    In speaking with the resident about the procedure, Plaintiff mentioned that he had co-authored a published paper on the technique that is in ubiquitous use for this procedure, titled "the Houdini Clavicle," and recommended that the resident read the paper.

78.    Plaintiff then mentioned in passing that the resident should be careful what verbage he used to search for the paper online because Plaintiff had been told by a colleague that the colleague had entered "the Houdini" into a search engine to find the paper and had received an obscene result.

79.     On June 3, Chair Todorovic terminated Plaintiff effective June 30, 2016 and placed him on administrative leave effective immediately allegedly for performance issues "in the areas of interpersonal communication, proper record keeping and professionalism."

80.     Prior to his termination, Plaintiff had only ever received annual performance ratings of "outstanding" and had never been placed on a performance improvement plan, disciplined, or otherwise told that he was in danger of being terminated due to a performance issue.

81.     On June 25, 2016, Plaintiff's colleague with whom he had lunch in Vail on March 2 called Plaintiff to say that the colleague had heard a rumor from staff at the Veteran's Affairs Hospital in Denver that Plaintiff had been terminated because he had dispensed pornography to residents at CU.

82.     Because CU is the only academic medical institution in Colorado, Plaintiff has been unable to obtain equivalent employment as a professor and clinician.

83.     CU's discriminatory and retaliatory treatment of Plaintiff caused him significant emotional distress, including sadness, weight loss, energy loss, and a decline in interest in activities that previously brought him enjoyment.

84.     On February 8, 2017, Plaintiff filed charge of discrimination number 541-2017-01466 with the U.S. Equal Employment Opportunity Commission ("EEOC") in which he alleged that CU discriminated against him based on his race and national origin and retaliated against him in violation of Title VII.

85.     On February 14, 2018, the Civil Rights Division of the U.S. Department of Justice issued Plaintiff a notice of right to sue with respect to charge of discrimination number 541-2017-01466.

## STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF
(Race and National Origin Discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, against Defendant)

86.     The foregoing allegations are realleged and incorporated herein by reference.

87.     CU subjected Plaintiff to different terms and conditions of his employment based on race and national origin.  This treatment included, but is not limited to: treating Plaintiff in a condescending manner, including questioning the value that he brought to CU; investigating Plaintiff without cause; failing to promote Plaintiff to the medical director position of either the Lone Tree or Broomfield facility; crediting accusations made against Plaintiff that lacked basis; accusing Plaintiff of lying, being unprofessional, and being difficult to work with; failing to investigate or otherwise address Plaintiff's complaints about race and national origin discrimination; terminating him based on alleged performance issues that lacked basis; and making untrue and disparaging statements about the reason for Plaintiff's termination to others.

88.     CU's conduct discriminated against Plaintiff on the basis of his race and national origin in violation of Title VII.

89.     As a direct and proximate result of CU's actions, Plaintiff has suffered damages, including lost wages and benefits, diminished reputation and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

**SECOND CLAIM FOR RELIEF**
(Retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended,
against Defendant)

90.     The foregoing allegations are realleged and incorporated herein by reference.

91.     Plaintiff participated in statutorily protected activity by opposing practices

targeted at him that were unlawful under Title VII, including discrimination based on race and

national origin.

92.     As a result of Plaintiff's protected opposition to discrimination, CU retaliated

against him by subjecting him to the different terms and conditions of employment as described

in this Complaint, including, but not limited to: treating Plaintiff in a condescending manner,

including questioning the value that he brought to CU; investigating Plaintiff without cause;

failing to promote Plaintiff to the medical director position of either the Lone Tree or Broomfield

facility; crediting accusations made against Plaintiff that lacked basis; accusing Plaintiff of lying,

being unprofessional, and being difficult to work with; failing to investigate or otherwise address

Plaintiff's complaints about race and national origin discrimination; terminating him based on

alleged performance issues that lacked basis; and making untrue and disparaging statements

about the reason for Plaintiff's termination to others.

93.     CU's conduct violated 42 U.S.C. § 2000e-3(a) of Title VII.

94.     As a direct and proximate result of CU's actions, Plaintiff has suffered damages,

including lost wages and benefits, diminished reputation and other pecuniary losses, and

emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other

non-pecuniary losses.

WHEREFORE, Plaintiff Jeffrey Gonzales respectfully requests that this Court enter judgment in his favor and against Defendant CU and order the following relief as allowed by law:

A.      Compensatory damages, including but not limited to those for emotional distress, inconvenience, mental anguish, and loss of enjoyment of life;

B.      Back pay and benefits;

C.      Injunctive and/or declaratory relief;

D.      Reinstatement or front pay and benefits;

E.      Attorney fees and costs of the action, including expert witness fees, as appropriate;

F.      Pre-judgment and post-judgment interest at the highest lawful rate; and

G.      Such further relief as justice allows.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted May 15, 2018.

By:     SWEENEY & BECHTOLD, LLC

s/Charlotte N. Sweeney
650 S. Cherry St., Ste. 700
Denver, CO 80246
Telephone: (303) 865-3733
Fax: (303) 865-3738
E-mail: cnsweeney@sweeneybechtold.com

s/Ariel B. DeFazio
650 S. Cherry St., Ste. 700
Denver, CO 80246
Telephone: (303) 865-3733
Fax: (303) 865-3738
E-mail: abdefazio@sweeneybechtold.com


ATTORNEYS FOR PLAINTIFF

Plaintiff's Address:
6863 S. Netherland Way
Aurora, CO 80016

## CERTIFICATION OF GOOD STANDING

I hereby certify that I am a member in good standing of the bar of this Court.


By:      SWEENEY & BECHTOLD, LLC

s/Charlotte N. Sweeney
650 S. Cherry St., Ste. 700
Denver, CO 80246
Telephone: (303) 865-3733
Fax: (303) 865-3738
E-mail: cnsweeney@sweeneybechtold.com

s/Ariel B. DeFazio
650 S. Cherry St., Ste. 700
Denver, CO 80246
Telephone: (303) 865-3733
Fax: (303) 865-3738
E-mail: abdefazio@sweeneybechtold.com

ATTORNEYS FOR PLAINTIFF