IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 1:18-cv-01178-RBJ

JEFFREY GONZALES,

    Plaintiff,

v.

UNIVERSITY OF COLORADO, through its Board, THE REGENTS OF THE UNIVERSITY OF COLORADO, a body corporate,

    Defendant.

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on defendant University of Colorado ("CU")'s motion for summary judgment. ECF No. 29. For the reasons stated herein, the motion is DENIED.

### I. BACKGROUND

Plaintiff Dr. Jeffrey Gonzales is a former Assistant Professor and anesthesiologist at the University of Colorado's School of Medicine in the Department of Anesthesiology. ECF No. 9 ¶ 1. He alleges that CU retaliated against him by terminating him for complaining about discrimination. *Id*. Specifically, he claims that the Chair of the Department of Anesthesiology, Dr. Vesna Jevtovic-Todorovic ("the Chair"), used a falsely reported incident as a pretext to terminate him in retaliation for his race discrimination complaint against a fellow anesthesiologist. ECF No. 34 at 1.

Dr. Gonzales is of Mexican descent. ECF No. 34 ¶ 1. The School of Medicine hired him in August 2014. *Id*. ¶ 2. In addition to his daily duties, he also agreed to serve on the Acute Pain Service ("APS") under the direction of APS Director Dr. Matthew Fiegel. *Id*. Dr. Gonzales

worked on the APS three or fewer days per month.  *Id*.  In general, he received positive reviews from residents and in his employment reviews.  ECF No. 34 ¶¶ 4, 6.

Dr. Jevtovic-Todorovic became Department Chair in January 2016.  *Id.* ¶ 5.  Shortly after her arrival, Dr. Gonzales told the Chair that he was interested in medical director positions at the new CU facilities in Broomfield and Lone Tree.  *Id*. ¶ 8.  The Chair noted his interest and told him that she would "keep [him] informed about the Broomfield opening."  *Id*.  Neither position had a formal application process.  *Id*.

On March 4, 2016 unaffiliated anesthesiologist Dr. Henri Acosta told Dr. Gonzales about a text Dr. Acosta had received from Dr. Fiegel, Dr. Gonzales' APS supervisor.  *Id.* ¶ 9.  The text asked Dr. Acosta whether Dr. Gonzales had been "talking shit about the APS" at a conference.  *Id.* ¶ 9; ECF No. 29 ¶ 4.  ECF No. 34 ¶ 10.  Given that Dr. Gonzales had pre-existing problems with the APS, Dr. Fiegel's text was the "straw that broke the camel's back."  *Id*.  He decided to quit within hours of learning about the text—he asked to be removed from the APS schedule and emailed the Chair.  ECF No. 29 ¶ 4; ECF No. 34 ¶ 10.

The Chair excused Dr. Gonzales from the APS "without issue" after he showed her the text and denied Dr. Fiegel's accusation.  *Id*.  In internal emails between the Chair and co-worker Christopher Lace on March 8, the Chair expressed concern with how Dr. Gonzales had handled his resignation and stated that she "would not like to consider any type of leadership position for him for now" because she "need[ed] more time to assess his performance and commitment to the department, especially his ability to be a team member."  ECF No. 39-4 at 2–4.

<u>The Discrimination Complaint</u>

On March 7, 2016 Dr. Fiegel texted Dr. Acosta saying, "There's now a spot on the APS for a Mexican.  You interested??" (labeled in the motion as the "Mexican text").  ECF No. 29 ¶

5. Dr. Acosta replied, "The U[niversity] can't afford me." *Id*. Dr. Acosta forwarded a screenshot of the Mexican text to Dr. Gonzales the next day. *Id.* ¶ 7. Dr. Acosta also forwarded to Dr. Gonzales a video of a device located in the main preoperative area that played a recording of Dr. Fiegel making a homophobic statement. *Id*.

Dr. Gonzales was concerned about Dr. Fiegel's discriminatory statements and brought those concerns to three different offices within CU. On March 9 he reached out to Dr. Barry Rumack, Director of the Office of Professionalism. ECF No. 34 ¶ 12. Via Dr. Rumack's secretary, they scheduled a meeting for March 23. *Id*. On March 14 Dr. Gonzales spoke with Will Dewese, Co-Director of the Office of Equity, about the Mexican text, general discrimination in the Department, and his contact with Dr. Rumack. *Id.* ¶ 13. On March 17 Dr. Gonzales relayed the same concerns to Brad Mathers in Human Resources. *Id.* ¶ 14.

On March 19 the Chair emailed Dr. Gonzales about his sudden resignation from the APS service. ECF No. 29 ¶ 10. She informed him that after investigating Dr. Fiegel's accusation that he was speaking poorly of APS, she found those accusations to be substantiated and noted that she was "glad that [they] have agreed that this would not happen again." ECF No. 29-4 at 7. She also wrote, "I expect that in the future you will communicate with me in person rather than via email your decisions that could impact the productivity of our Department." *Id*.

At the scheduled March 23 meeting with Dr. Rumack in the Office of Professionalism, Dr. Gonzales provided a screenshot of the Mexican text and told him about the recording of Dr. Fiegel's homophobic statement. ECF No. 34 ¶ 17. Dr. Gonzales also expressed concern about the Chair's "recent hostility" towards him. *Id*. Dr. Rumack explained to Dr. Gonzales that he must inform a chair or division chief if reported conduct is egregious enough to require an intervention. ECF No. 29 ¶ 11. Dr. Rumack also explained that most cases are reviewed by a

3

professionalism executive committee, which includes senior associate deans, the head of legal HR, and others. *Id*. Dr. Rumack's notes show that he planned to "[m]eet with HR to evaluate racist and homophobic issues" and to "meet with [the Chair] . . . to resolve the [APS] resignation issue." ECF No. 34-14. Dr. Rumack claims that he did not speak with the Chair about Dr. Gonzales until a month later. ECF No. 34 ¶ 17.

Dr. Gonzales had several follow-up meetings with the various CU offices. He met with Dr. Rumack again in late March or early April. *Id.* ¶ 18. At that time Dr. Rumack offered to mediate between Dr. Gonzales and the Chair, but Dr. Gonzales declined. *Id*. Dr. Gonzales later relayed concerns about retaliation via an email to Dr. Rumack. *Id*. In April, Dr. Gonzales spoke again with Mr. Mathers in HR about discrimination and retaliation. *Id.* ¶ 19. Dr. Gonzales was concerned because the Chair had just told him that a surgeon, Dr. Gajdos, allegedly had interpersonal issues with Dr. Gonzales. *Id*. On May 3 Mr. Dewese of the Office of Equity set up a meeting between himself, Co-Director Karey Krohnfeldt (f/k/a Duarte), and Dr. Gonzales to begin investigating Dr. Gonzales' discrimination complaint. *Id.* ¶ 20.

While Dr. Gonzales' complaint was pending with the Office of Equity, the Office of Professionalism, and HR, the Chair chose other physicians to fill the Lone Tree and Broomfield Medical Director roles. *Id.* ¶ 20. The Chair did not follow up with Dr. Gonzales as she promised. *Id*.

### The Houdini Incident

Meanwhile, on April 18 anesthesiology resident Dr. Nathaniel Brown ("the Resident"), complained to Assistant Professor of anesthesiology Dr. Alison Brainard about a "very disturbing encounter" with Dr. Gonzales. *Id.* ¶ 24; ECF No. 34-17. In an email to Dr. Rumack that same day, Dr. Brainard wrote that she and the Chair had "convinced [the Resident] to come

4

forward with his story," and that they had "advis[ed] him to reach out to [Dr. Rumack's] office, as this is an attending with an open investigation." ECF No. 34-17. She also noted that they had "been unable to find other residents with similar stories." *Id*. Dr. Brainard and the Chair met with the Resident to hear his full story on April 20. ECF No. 29 ¶ 12.

The Resident alleged that in January 2016, he and Dr. Gonzales were discussing an article that Dr. Gonzales had co-authored called "The Houdini Clavicle." ECF No. 34 ¶ 23. Allegedly, Dr. Gonzales asked the Resident if he knew what the "Houdini maneuver" was and told him to look it up on Urban Dictionary. *Id.*; ECF No. 29 ¶ 12. The Resident looked it up and found that it referred to two "vulgar sex acts," including one which involved rape. ECF No. 29 ¶ 13. When the Resident returned to Dr. Gonzales with this newfound information, Dr. Gonzales allegedly laughed it off and responded that "all research is bullshit." *Id.* ¶ 14.

Per Dr. Brainard and the Chair's suggestion, the Resident also met with Dr. Rumack in the Office of Professionalism the following day on April 21. ECF No. 29 ¶ 18. After the meeting, Dr. Rumack and the Chair met to compare the Resident's descriptions of the incident. *Id.* ¶ 19. They agreed that the descriptions were consistent and credible, and Dr. Rumack suggested that the Chair consider termination. *Id*. Dr. Rumack also referred the Resident to Ms. Krohnfeldt in the Office of Equity. *Id.* ¶ 18. On April 22 the Resident spoke with Ms. Krohnfeldt, who initiated an investigation into the Houdini incident. ECF No. 29-7 at 1, 4.

The Chair alleges that between April 22 and April 25 she decided to terminate Dr. Gonzales' faculty appointment based on the Houdini incident. ECF No. 29 ¶ 20. The Chair claims that she did not know about Dr. Gonzales' discrimination complaint at the time. ECF No. 34 ¶ 30. However, she does recall Dr. Rumack advising her to be "very careful" about how she terminated Dr. Gonzales. *Id*. On April 22 Dr. Rumack informed an employee in the Office of

Equity and a colleague in the Office of Professionalism that the situation with Dr. Gonzales was moving towards termination. ECF No. 29 ¶ 21. He indicated the same to an employee in HR the following day. *Id.* ¶ 23.

On April 25 the Chair consulted with the Dean of the School of Medicine, Dr. John Reilly. *Id.* ¶ 24. Dr. Reilly agreed with the Chair's termination decision. *Id.* Four days later, the Chair asked a Department administrator to draft a termination letter. *Id.* However, Director of Human Resources Doug Kasyon advised the Chair to delay terminating Dr. Gonzales until (1) Ms. Krohnfeldt in the Office of Equity had reviewed this incident and (2) Dr. Gonzales had an opportunity to respond to the allegation. *Id.*

Unrelated to the Houdini incident, on May 6 the Chair learned that in April Dr. Gonzales had failed to properly document an anesthesia procedure he had performed. ECF No. 29 ¶¶ 25, 37. CU alleges that this "resulted in a significant patient care issue." *Id.* Dr. Gonzales acknowledges the documentation mistake but disputes that it was a significant patient care issue. ECF No. 34 at 2.

<u>The Investigations</u>

Ms. Krohnfeldt in the Office of Equity performed an initial review of both Dr. Gonzales' discrimination complaint and the Resident's complaint about the Houdini incident. ECF No. 29 ¶¶ 27–28; ECF No. 34 ¶ 35. The Office of Equity reviews complaints by determining whether, if true, they would violate CU's nondiscrimination policy. ECF No. 34 ¶ 33. Only if the assumed-true complaints are determined to be a policy violation does the Office of Equity proceed to conduct a full investigation, including witness interviews. *Id.*

Regarding Dr. Gonzales' complaint about discrimination, Ms. Krohnfeldt determined that assuming it was true, Dr. Fiegel's conduct would not constitute a violation of the

6

nondiscrimination policy. ECF No. 29 ¶ 28. However, she noted that the conduct was "unprofessional." *Id*. She informed Dr. Gonzales of this finding via voicemail on May 18 and via email on May 24. *Id.* ¶ 29; ECF No. 29-12 at 2.

Ms. Krohnfeldt reached the same conclusion regarding the Resident's complaint about the Houdini incident. ECF No. 29 ¶ 27. She determined that assuming it was true, Dr. Gonzales' conduct would not constitute a violation of the nondiscrimination policy. *Id*. However, she also noted that the conduct was "entirely unprofessional." *Id*.

Because Ms. Krohnfeldt concluded that neither complaint rose to the level of a policy violation, she did not initiate a full investigation and thus did not conduct interviews of anyone except the respective complainants. ECF No. 34 ¶ 34. Per standard practice, on May 24 she referred both complaints back to the Chair for any such discipline the Chair deemed appropriate. *Id.* ¶ 35; ECF No. 29 ¶¶ 27–28. The Chair alleges that this was the first time she learned of Dr. Gonzales' complaint about discrimination. ECF No. 34 ¶ 35; ECF No. 35-1 at 168:1–18. Ms. Krohnfeldt, Dr. Rumack, and Mr. Kasyon all confirm that they did not tell the Chair about Dr. Gonzales' complaint prior to May 24. ECF No. 29 ¶ 31.

However, the facts show potential inconsistency on this issue. Dr. Fiegel testified that the Chair informed him in March about Dr. Gonzales' complaint. ECF No. 34-20 at 27:5–28:23. Additionally, Dr. Rumack emailed the Chair on April 20 to inform her that Ms. Krohnfeldt "ha[d] the text messages regarding the 'Mexican' statement" and asking her whether she had "been able to retrieve the button that says Feigel [sic]." ECF No. 29-20 at 2. The Chair responded only that she "did get the button from the preop area." *Id.* at 1. In the instant litigation, the Chair testified that she "did not remember receiving" this email, and that she "must

7

have reviewed the email and only paid attention to Dr. Rumack's action item, which was retrieving the button." ECF No. 29-10 ¶ 24.

Termination

On June 2 the Chair met with Dr. Gonzales and confronted him with the Resident's complaint. ECF No. 34 ¶ 23. Although she had already decided to terminate Dr. Gonzales, the Chair testified she had been open to reconsideration depending on his response to this confrontation. ECF No. 29-19 at 169:3–19. However, instead of acknowledging and apologizing for the incident, Dr. Gonzales denied that it occurred. ECF No. 29-11 ¶ 21. He admitted to telling people that the "Houdini maneuver" is in Urban Dictionary but denied referring any resident to the entry. *Id.* Testifying in the instant litigation, Dr. Gonzales recalls discussing the article with residents but denies ever mentioning the "Houdini maneuver" to the Resident. ECF No. 34-1 at 106:7–107:11, 109:19–110:8.

On June 3 the Chair terminated Dr. Gonzales' faculty appointment. ECF No. 29 ¶ 36. She testified that she had already made this decision based on the Houdini incident, but that her decision was "reinforced" when she learned in May about Dr. Gonzales' failure to properly document the anesthesia procedure. ECF No. 29 ¶ 37; ECF No. 29-11 ¶ 16. The June 3 termination letter cited "job performance in the areas of interpersonal communication, proper record keeping and professionalism" as the reasons for Dr. Gonzales' termination. ECF No. 34 at ¶ 39. In its response to Dr. Gonzales' subsequent EEOC charge, CU attributed Dr. Gonzales' termination to two staff complaints filed in approximately December 2015; his abrupt resignation from APS; Dr. Gajdos' interpersonal issues with him; the Resident's complaint; and his failure to properly document the anesthesia procedure. ECF No. 34-22 at 2–4.

Procedural History

Dr. Gonzales filed a charge with the EEOC on February 8, 2017. ECF No. 9 ¶ 84. He alleges that CU discriminated against him based on his race and national origin and retaliated against him in violation of Title VII. *Id.* He filed a complaint in this Court on May 15, 2018. ECF No. 1. He filed an amended complaint on July 20, 2018. ECF No. 9.

In his amended complaint, Dr. Gonzales brings one claim for retaliation under Title VII against CU. ECF No. 9 ¶¶ 86–90. He claims CU retaliated by:

> treating Plaintiff in a condescending manner . . . ; investigating Plaintiff without cause; failing to promote Plaintiff to the medical director position of either the Lone Tree or Broomfield facility; crediting accusations made against Plaintiff that lacked basis; accusing Plaintiff of lying, being unprofessional, and being difficult to work with; failing to investigate or otherwise address Plaintiff's complaints about race and national origin discrimination; terminating him based on alleged performance issues that lacked basis; and making untrue and disparaging statements about the reason for Plaintiff's termination to others.

*Id.* ¶ 88. CU has filed the instant motion for summary judgment arguing that (1) Dr. Gonzales cannot establish a claim for retaliation based on his termination; and (2) Dr. Gonzales cannot establish a claim for retaliation based on the Chair's failure to promote him. ECF No. 29.

## II. STANDARD OF REVIEW

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. A fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The Court will examine the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

### III. ANALYSIS

Title VII forbids retaliation against an employee because he has "opposed" any practice made unlawful by Title VII, or because he has "participated . . . in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Where there is no direct evidence of retaliation, as here, we analyze the claim under the *McDonnell Douglas* burden-shifting framework. *See Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004) (citing *McDonnell Douglas Corp.,* 411 U.S. at 802–04) (applying the *McDonnell Douglas* framework to a claim of retaliation). To establish a prima facie case of retaliation under *McDonnell Douglas*, a plaintiff must show (1) that he engaged in protected opposition to discrimination, (2) that his employer took an adverse employment action against her, and (3) there exists a causal connection existed between the protected activity and the adverse action. *See id*. at 1071. Should a plaintiff establish a prima facie case, the burden shifts to the employer to articulate a legitimate, non-retaliatory justification for the action. *See id*. If the employer meets this burden, the burden shifts back to the employee to provide evidence that the employer's proffered reason is a mere pretext for discrimination. *See id*.

Here, CU argues that Dr. Gonzales cannot establish retaliation regarding either his termination or the Chair's failure to promote him to the medical director positions at Broomfield and Lonetree. I address both alleged adverse employment actions in turn.

10

### A. Termination

Dr. Gonzales claims that he was terminated in retaliation for filing a complaint against Dr. Fiegel for discrimination. *See* ECF No. 9 ¶¶ 86–90. In response, CU argues that (1) Dr. Gonzales cannot prove a prima facie case of retaliation, and (2) even if Dr. Gonzales can prove a prima facie case, CU presents legitimate, non-discriminatory justifications for his termination which Dr. Gonzales cannot show are pretextual. *See* ECF No. 29 at 11–12.

1. Prima Facie Case

CU does not dispute the first two prongs of the prima facie standard: that Dr. Gonzales engaged in protected opposition to discrimination by complaining about Dr. Fiegel, and that CU took an adverse employment action against him by terminating him. However, CU argues that Dr. Gonzales cannot establish a causal connection between Dr. Gonzales' complaint and his termination. ECF No. 29 at 11. To establish a causal connection, a plaintiff must present evidence of circumstances that justify an inference of retaliatory motive. *See Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014). Evidence of "protected conduct closely followed by adverse action" can suffice to establish causation. *Marx v. Schnuck Mkts.*, 76 F.3d 324, 329 (10th Cir. 1996).

CU argues that the Chair decided to terminate Dr. Gonzales based on the Houdini incident before learning about his discrimination complaint. *See id*. The Chair testified that she made this decision between April 22 and April 25. *See* ECF No. 29 ¶ 20. She further claims that she did not know about Dr. Gonzales' discrimination complaint until May 24, when Ms. Krohnfeldt in the Office of Equity sent her the findings of her preliminary review. *See* ECF No. 34 ¶ 35; ECF No. 35-1 at 168:1–18.

However, Dr. Gonzales has presented conflicting evidence about when the Chair learned of his discrimination complaint. For one, Dr. Fiegel testified that the Chair informed him in March about Dr. Gonzales' complaint. *See* ECF No. 34-20 at 27:5–28:23. Although he cannot recall specific dates, he testified that the Chair pulled him aside twice. The first time she did not expressly mention the Mexican text but told him "that Dr. Gonzales had presented some texts to the department" and "some information that there was a recording device in the preoperative area that had [Dr. Fiegel's] voice on it saying inappropriate things." *Id*. This occurred "maybe a few weeks to a month" prior to a meeting that occurred in March. *See id*. The Chair expressly informed Dr. Fiegel about the Mexican text during a second conversation, which also occurred sometime "prior to that official meeting in March." *Id*. Given that Dr. Gonzales did not bring his complaint to anyone at CU until March 14 (although he contacted Dr. Rumack's secretary about scheduling a meeting on March 9), and assuming the truth of Dr. Fiegel's testimony, Dr. Fiegel and the Chair must have discussed these texts sometime in March. *See* ECF No. 34 ¶ 12.

Additionally, Dr. Gonzales notes an April 20 email from Dr. Rumack to the Chair referencing both "the text messages regarding 'the Mexican' statement" and the button with the homophobic recording. ECF No. 29-20 at 2. The Chair claims that she does not remember receiving this email and must have only paid attention to Dr. Rumack's request that she retrieve the button. *See* ECF No. 29-10 ¶ 24. CU also notes that this email does not mention that Dr. Gonzales was the one who complained about the texts. Yet a reasonable juror could infer from this email that Dr. Rumack and the Chair had prior conversations about the texts, which may have included express discussion of Dr. Gonzales' involvement. Further, the Chair testified about her memory of this email in an affidavit dated April 26, 2019—three years after the email

12

was sent on April 20, 2016. A reasonable juror could attribute her lack of memory of the email to mere passage of time.

Assuming that the Chair did know about Dr. Gonzales' complaint as early as either March or April 20, 2016, then she had knowledge of Dr. Gonzales' complaint before she decided to terminate him sometime between April 22 and April 25. This also means there was only a short time span between her discovery of Dr. Gonzales' initial complaint and her decision to terminate him. Such a short time span between the protected activity and the adverse employment action would suffice to establish an inference of causation here. *See Marx*, 76 F.3d at 329. Because there remains genuine dispute of material fact regarding whether the Chair knew of Dr. Gonzales' complaint prior to terminating him, I find that Dr. Gonzales has presented sufficient evidence of a prima facie case of retaliation at the summary judgment stage.

### 2. Legitimate, Non-Retaliatory Justification and Pretext

CU next argues that even if Dr. Gonzales can sufficiently establish a prima facie case, he cannot establish that the Chair's legitimate, non-retaliatory justification was merely pretext for retaliation. The Chair testified that her decision to terminate Dr. Gonzales was based mainly on the Houdini incident. *See* ECF No. 29 ¶ 37. CU also notes three additional problems that, while not alone sufficient to warrant termination, contributed to the Chair's decision: (1) Dr. Gonzales' resignation from APS, (2) interpersonal problems with Dr. Gajdos, and (3) Dr. Gonzales' failure to properly document the anesthesia procedure. *See id.* at 5. Given the extremely unprofessional nature of the Houdini incident allegations, I find that CU has met its burden of showing a legitimate, non-retaliatory justification. *See Stover*, 382 F.3d at 1071. As such, the burden shifts back to Dr. Gonzales to establish that the Houdini incident was merely pretext for retaliation.

To establish pretext at the summary judgment stage, "we need only determine whether the evidence [the plaintiff] presented, viewed in a light most favorable to [him], could allow a reasonable jury to find that [the employer's] reasons were pretextual." *Potter v. Synerlink Corp.*, 562 F. App'x 665, 674–75 (10th Cir. 2014). A plaintiff must show that the employer's proffered reasons "were so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief." *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (quoting *Stover*, 382 F.3d at 1076). "[T]he pertinent question in determining pretext is not whether the employer was right to think the employee engaged in misconduct, but whether that belief was genuine or pretextual." *Hardy v. S.F. Phosphates L.C.,* 185 F.3d 1076, 1080 (10th Cir.1999) (internal quotations omitted).

Additionally, "we must consider the evidence of pretext in its totality." *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1174 (10th Cir. 1998). Evidence of pretext can include (1) temporal proximity, *see Annett v. Univ. of Kan.,* 371 F.3d 1233, 1240 (10th Cir. 2004) (noting that temporal proximity alone is not sufficient to defeat summary judgment); (2) inconsistent explanations for termination, *see Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 887 (10th Cir. 2018); (3) disturbing procedural irregularities such as falsifying or manipulating data, *see Simms v. Okla. ex rel. Dept. of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir. 1999), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002); (4) prior treatment of the employee-plaintiff, *see id.*; (5) differential treatment of similarly situated employees, *see Potter v. Synerlink Corp.*, 562 Fed. Appx. 665, 675–76 (10th Cir. 2014); and (6) the credibility of the decision-maker as a witness, *see id.* at 676–77.

Dr. Gonzales proffers several pieces of evidence to establish pretext. I find that four pieces of his proffered evidence are particularly relevant. First, he argues that the temporal

14

proximity is relevant in showing pretext. He made several complaints to various employees between March 14 and early May. *See* ECF No. 34 ¶¶ 13–14, 17–20. The Chair decided to terminate him sometime between April 22 and April 25, and ultimately terminated him on June 3. Dr. Gonzales also notes that he was denied two promotions in the interim, although he does not provide specific dates for these denials. *See* ECF No. 34 at 15. This close temporal proximity suggests pretext. *See Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1206 (10th Cir. 2000) (noting that temporal proximity of two and a half months suggests pretext).

However, CU argues that the Houdini incident is an intervening event that negates pretext. The Tenth Circuit in *Twigg v. Hawker* "recognized that evidence of temporal proximity has minimal probative value in a retaliation case where intervening events between the employee's protected conduct and the challenged employment action provide a legitimate basis for the employer's action." *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1001-02 (10th Cir. 2011). Yet the plaintiff in *Twigg* proffered temporal proximity as direct evidence of retaliatory motive at the prima facie stage, not at the pretext stage. Significantly, in that case there was also a year-long gap between the plaintiff's protected activity and her termination. *See id.* at 991, 997.

CU also cites to *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1196–98 (10th Cir. 2006), to cut against Dr. Gonzales' temporal-proximity argument. Yet in *Argo* the plaintiff had received multiple warnings about attendance and performance issues for months before receiving a "last warning" that specifically threatened termination for future infractions. *Id.* at 1203. Three days after receiving this "last warning," the plaintiff filed a discrimination complaint. *See id*. Twenty-four days after filing the complaint, he arrived late for work again. *See id*. The employer terminated him the following day. *See id*. Here, in contrast, CU does not

allege in its motion that it had termination-worthy problems with Dr. Gonzales prior to his filing the discrimination complaint.[1] A reasonable juror might find that even though the Houdini incident is an intervening event, temporal proximity between his discrimination complaint and his termination may still suggest pretext.

Second, Dr. Gonzales alleges certain procedural irregularities. Most of the alleged irregularities he cites are not evidence of pretext because they are consistent with CU's internal policies. *See Simms*, 165 F.3d at 1329. For example, Dr. Gonzales admits that the fact that Ms. Krohnfeldt only interviewed the complainants in each respective complaint is consistent with the Office of Equity's internal policy. *See* ECF No. 34 ¶ 33. However, Dr. Gonzales does point out that despite his several complaints about retaliation, apparently no CU office or employee looked into his retaliation concerns. *See id*. A reasonable juror might find it significant in combination with other indications of pretext.

Third, Dr. Gonzales claims that he has been treated differently in comparison to Dr. Fiegel, a similarly situated employee. He and Dr. Fiegel have the same supervisor, were subject to the same standards, and had comparable experience, education, and qualifications. *See Aramburu v. The Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997). Complaints were made about the conduct of both employees, and the Office of Equity reached the same conclusion on each: the conduct was "unprofessional" but did not constitute a policy violation. *See* ECF No. 29 ¶¶ 27–28. The Chair decided to terminate Dr. Gonzales within a week of officially learning

---

[1] In its response letter to Dr. Gonzales' EEOC charge, CU did allege that Dr. Gonzales' history of poor "interpersonal communication" included two complaints against him from December 2015 as well as his March 4, 2016 resignation from the APS, all of which occurred prior to his filing of the discrimination complaint. ECF No. 34-22 at 2–4. CU again mentioned one of the December 2015 complaints in its reply brief in the context of differentiating Dr. Gonzales from an allegedly similarly situated employee. *See* ECF No. 40 at 6–7. However, Dr. Gonzales' termination letter did not include these incidents, neither the Chair nor anyone else testified that these incidents played a role in his termination, and CU maintains in its briefs that the termination was based on the Houdini incident, his resignation from APS, and his failure to properly document the anesthesia procedure. *See id.* at 5.

about the Houdini incident.  Yet on June 30, 2016, a month after learning about the complaint against Dr. Fiegel, the Chair merely issued Dr. Fiegel a letter of direction.  *See* ECF No. 34 ¶ 37.

CU argues that Dr. Fiegel is not a proper comparator because the conduct at issue is materially different.  *See Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1232–33 (10th Cir. 2000) (finding that an employer "must be allowed to exercise its judgment in determining how severely it will discipline an employee for different types of conduct").  While Dr. Fiegel's conduct was directed at an unaffiliated anesthesiologist, Dr. Gonzales' conduct was directed at a resident who was under his educational supervision.  *See* ECF No. 40 at 6.  CU claims that the power dynamic between Dr. Gonzales and the Resident was a key aspect of the egregiousness of his conduct.  Indeed, Dr. Rumack's April 21 email to the Resident noted that "since you are being educated [this] may be a [T]itle IX violation."  ECF No. 29-8 at 2.  CU's argument on this point is compelling.  However, given the drastic difference in treatment between these two employees, and given the similarity of their situations setting aside the power dynamic issue, a reasonable juror might still find it significant in combination with other indications of pretext.

Fourth, Dr. Gonzales also questions the witness credibility of the decision-maker in his termination, i.e., the Chair.  As discussed, there are inconsistencies in the Chair's testimony about when she first learned of Dr. Gonzales' discrimination complaint.  Evidence that the Chair lied about a fact as important to this case as when she learned of Dr. Gonzales' complaint could suggest that she did not have an honest belief in her asserted reason for terminating him.

Taking all of this evidence of pretext together, a reasonable juror could find that Dr. Gonzales has established sufficient evidence of pretext.  *See Beaird*, 145 F.3d at 1174.  Accordingly, CU's motion for summary judgment on Dr. Gonzales' retaliatory termination claim is denied.

### B. Failure to Promote

CU also asserts that Dr. Gonzales cannot establish a retaliation claim based on the Chair's failure to promote him to either of the two leadership positions at the university's Broomfield and Lonetree facilities. *See* ECF No. 29 at 17.

However, it is unclear to what extent Dr. Gonzales is asserting such a claim. Dr. Gonzales' amended complaint lists a litany of allegedly retaliatory conduct under his single claim for relief of retaliation (much of which, incidentally, seems more aptly addressed under a hostile work environment claim). *See* ECF No. 9 ¶ 88. He does not expressly specify in his complaint what the relevant adverse employment action is. CU's motion for summary judgment treats Dr. Gonzales's complaint as if he has only alleged two adverse employment actions: the termination and the failure to promote. Dr. Gonzales' response to CU's motion appears to treat his own complaint as having alleged only a single adverse employment action: the termination. He does not ever mention the failure to promote in the context of a separate adverse employment action. Nor does Dr. Gonzales address CU's argument that he cannot establish a retaliation claim based on the failure to promote.

I therefore interpret Dr. Gonzales' argument about failure to promote as contextual to his retaliatory termination claim, not as a separate adverse employment action.

**ORDER**

Defendant's motion for summary judgment, ECF No. 29, is DENIED.

DATED this 21st day of November, 2019.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge